UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                             :

TOWER 570 COMPANY LP,                :
                             :

               Plaintiff,        :

                             :            20-CV-0799 (JMF)

      -v-                   :

                             :        <u>OPINION AND ORDER</u>

AFFILITATED FM INSURANCE COMPANY,  :

                             :

              Defendant.     :

                             :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On May 20, 2019, an electrical "arc-fault" occurred in one of the vertical cables that power 570 Lexington Avenue, a fifty-story building in Manhattan, causing significant property damage. Thereafter, Tower 570 Company LP ("Tower 570"), the limited partnership that owns the building, brought this suit against Affiliated FM Insurance Company ("AFM") and Travelers Property Casualty Company of America ("Travelers"), its insurers, seeking coverage for its loss. In February 2021, Tower 570 and Travelers settled their claims, leaving only the coverage dispute between Tower 570 and AFM. Now pending are Tower 570's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment with respect to the existence of insurance coverage; AFM's cross-motion for summary judgment; and three *Daubert* motions to exclude the testimony of expert witnesses.

For the reasons that follow, AFM's motion to exclude the testimony of Tower 570's expert witness is GRANTED, Tower 570's motion to exclude the testimony of AFM's expert witnesses is DENIED; AFM's motion for summary judgment is GRANTED in part and DENIED in part, and Tower 570's motion for summary judgment is DENIED.

## BACKGROUND

The relevant facts — drawn from the pleadings and admissible materials that the parties submitted in connection with these motions — are largely undisputed.

On May 20, 2019, an electrical arc-fault occurred within one of the four riser cables, known in this litigation as "Riser 1," that supplied electrical power to 570 Lexington Avenue in Manhattan.  ECF No. 134 ("SOF"), at ¶¶ 61, 62, 81.  An arc-fault occurs when the insulation on an electrical cable breaks down, causing a fault or a short.  *Id*. ¶ 23.  Under certain conditions, an arc-fault can result in an arc-flash, in which light and heat are produced, or an arc-blast, in which energy is released.  *Id*. ¶ 24.  An arc-flash or an arc-blast can be extremely destructive; "temperatures can reach or exceed 35,000°F at the arc flash point" and "[t]he energy released . . . is massive and will rapidly vaporize the metal conductors involved."  *Id*. ¶ 25.  The arc-fault at 570 Lexington occurred within a vault located on the twenty-third floor of the building, one of three locations where the riser cables are "spliced."  *Id*. ¶ 62; *see also* ECF No. 125-16, at 2.  The arc-fault led to an arc-flash and arc-blast, which caused damage to Riser 1; various other building components in the area, including the vault; and, potentially, the other three risers.  *See* SOF ¶¶ 53, 101-102; ECF No. 105-8, at 4; ECF No. 109-4; ECF No. 109-7 ("AFM Denial"), at 1.

At the time of the arc-fault, Tower 570 had two insurance policies — an "all-risk Policy" issued by AFM (the "AFM Policy"), which provided coverage for "all risks of physical loss or damage, except as hereinafter excluded," SOF ¶ 5 (emphasis omitted), and a "Boiler & Machinery Policy" issued by Travelers (the "Travelers B&M Policy"), which provided coverage for a narrower range of losses, SOF ¶¶ 57-58.  As relevant here, the AFM Policy included a

"boiler and machinery" exclusion, *see* ECF No. 125-3 ("AFM Policy"),[1] at 24, excluding

coverage for "[d]irect physical loss or damage originating within: . . . [a]ll mechanical, electrical,

electronic or fiber optic equipment; [a]nd caused by, resulting from or consisting of: . . .

[e]lectrical or electronic breakdown," *id.* at 79.  Importantly, the AFM Policy also provided that

"boiler and machinery as used in this Policy does not mean: [p]hysical loss or damage caused by

or resulting from any of the following regardless of any other cause or event contributing

concurrently or in any other sequence to the loss: . . . [c]ombustion explosions, . . .; or . . . [f]ire."

*Id.* (emphasis omitted).  The AFM Policy also included a "wear and tear" exclusion, excluding

coverage for "[w]ear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice or

latent defect."  *Id.* at 41-42; SOF ¶ 12.  The Travelers B&M Policy, on the other hand, covered

"a 'Breakdown' to 'Covered Equipment,' unless the loss is excluded elsewhere."  ECF No. 125-

2 ("Travelers Policy"), at 16.  As relevant here, a "Breakdown" included "[e]lectrical failure

including arcing . . . unless such loss or damage is otherwise excluded," and "Covered

Equipment" included "[a]ny other electrical or mechanical equipment that is used in the

generation, transmission or utilization of energy."  *Id*. at 34-35.

On May 22, 2019, Tower 570 reported the loss to AFM as an "explosion."  SOF ¶ 14.  It

also provided Travelers with notice of the loss.  ECF No. 42 ("SAC"), at ¶ 31.  The next day,

AFM acknowledged receipt of the notice and began its investigation.  SOF ¶ 15.  On August 8,

2019, Tower 570 executed a "sworn statement in proof of loss," stating that its claim for loss

resulted from "Electrical Arching [sic]."  ECF No. 109-6; SOF ¶ 68.  On September 11, 2019,

AFM denied Tower 570's claim, stating: "As electrical breakdown of the left most riser cable

---

[1]     Page references to the AFM Policy (ECF No. 125-3) and the Travelers B&M Policy
(ECF No. 125-2) are to the page numbers automatically generated by the Court's Electronic Case
Filing system.

resulted in the damage to the other three riser cables and adjacent building components, the loss is subject to the Boiler and Machinery Exclusion." SOF ¶ 18 (emphasis omitted); AFM Denial 4. In addition, AFM stated that "the deterioration of the riser cable insulation is specifically excluded." SOF ¶ 14; AFM Denial 4. Tower 570 did little better with Travelers; of the total loss of $4,977,971.46 that Tower 570 claimed, Travelers issued payment for only $483,500. SAC ¶¶ 33-34.

On January 29, 2020, Tower 570 filed this lawsuit against both AFM and Travelers. ECF No. 2. On February 12, 2021, Tower 570 settled its claims with Travelers "for the full cost of the repair and replacement of Riser 1"; accordingly, Tower 570 now "makes no claim for the damage to Riser 1 under the [AFM Policy]." SOF ¶¶ 52, 76, 96; *see also* ECF No. 80. On July 22, 2021, Tower 570 filed its motion for summary judgment, ECF No. 107, as well as *Daubert* motions to exclude the testimony of Dale Cagwin, AFM's combustion expert, ECF No. 111, and Christopher Minogue, AFM's loss estimation expert, ECF No. 114, and AFM filed a *Daubert* motion to exclude the testimony of John McBride, Tower 570's electrical engineering expert, ECF No. 103. On August 26, 2021, AFM filed a cross motion for summary judgment. ECF No. 122.

## MOTIONS TO PRECLUDE EXPERT TESTIMONY

For reasons that will be made clear, resolution of the parties' summary judgment motions turns at least in part on resolution of their motions to exclude expert testimony. Accordingly, the Court will begin with the latter.

### A. Applicable Legal Standard

The admissibility of expert testimony is governed by Rule 702, which provides, in relevant part, that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.  "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); ); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

The *Daubert* Court "enumerated a list of factors that . . . a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, its error rate, and its degree of acceptance within the relevant scientific community." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016). The focus of the analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison."

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up).  By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Id.* (internal quotation marks omitted).  "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.  Moreover, "[a]lthough a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule."  *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005) ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . .").

**B.  AFM's Motion to Preclude the Testimony of John P. McBride**

The Court will begin with AFM's motion to exclude the testimony of Tower 570's expert witness, John P. McBride, P.E.  ECF No. 104 ("Def.'s McBride Mem."), at 1.  Significantly, although the motion, on its face, purports to seek exclusion of McBride's testimony in its entirety, AFM's papers make plain that it seeks only to "preclude[ McBride] from testifying at trial as to whether the [a]rc [f]ault was a 'combustion explosion.'"  *Id.* at 19.  That is, AFM effectively concedes, as it must, that McBride is qualified to provide at least some expert testimony by virtue of his education and experience as an electrical engineer and his involvement in the day-to-day process of repairing and replacing the damaged electric risers.  *See id.* at 14 ("McBride may be qualified to testify about the electrical engineering aspects of this case, but he is not qualified to give expert opinions about combustion or combustion explosions."); *see also* ECF No. 126 ("Pl.'s McBride Opp'n"), at 2 (summarizing McBride's qualifications).  Instead, AFM's argument is that McBride has "no professional experience whatsoever with combustion"

and that his "opinion regarding whether the [a]rc [f]ault was a 'combustion explosion' is unsupported and unscientific." Def.'s McBride Mem. 12, 15 (cleaned up).

The Court agrees.  Significantly, McBride's initial expert report provides virtually no analysis on the relevant question of whether the arc-fault (or the resulting arc-flash or arc-blast) was a combustion explosion.  It merely states, in wholly conclusory terms, that "an arc-blast is a combustion explosion within the ordinary meaning of that term."  ECF No. 105-8 ("McBride Report"), at 4.  In his rebuttal report, McBride goes a bit further, explaining that, in his opinion, the blast is a combustion explosion because "the conductors react with oxygen in the air to result in an accelerated chemical reaction which results in a rapid rise in temperature, . . . [w]ithout oxygen as the oxidizer, there would be no arc-blast, just an arc."  ECF No. 105-12 ("McBride Rebuttal"), at 5.  But the only source that McBride provides to support his contention that an arc-blast involves a reaction with oxygen in the air is a YouTube video, which he neither created nor verified, which purportedly shows an arc-fault occurring in a partial vacuum.  *Id.* at 6; *see also* Def.'s McBride Mem. 18.  Notably, however, the experiment in the YouTube video does not even purport to show, as McBride claims, that, "when you have Oxygen present, and sufficient energy or potential, the fault will result in an arc-flash followed by an arc-blast."  McBride Rebuttal 5; *see* Experiments Robert33, *HV Voltaic Arc in Vacuum Chamber Test*, YouTube (Nov. 6, 2014), https://www.youtube.com/watch?v=WTPL-pm92eo ("YouTube Video").  Nor does it show that, "in a perfect vacuum, where no Oxygen is present, electrons will flow from one conductor to the other, creating a blue like stream."  McBride Rebuttal 5.  Instead, the video appears to show an arc-fault occurring in ambient air and then in a near-vacuum environment; neither produces an explosion.  YouTube Video.

Making matters worse, during his deposition, McBride was asked many times, in many different ways, to explain the scientific evidence or principle on which his opinion was based.

Yet he provided no satisfactory answer.  *See e.g.*, ECF No. 105-9 ("McBride Dep. Tr."), at 120

("Q. So your claim here is that the copper reacts with oxygen.  What is that based on from a

scientific standpoint?  A. I don't have the chemical formula, if that's what you're asking me for.

The chemical formula of an arc blast."); *id.* at 121 ("Q: So you're telling me that the copper

reacts to oxygen and I'd like to know where, other than you saying it, is that supported?  A.

That's what it does."); *id*. at 121-22 ("I'm going to tell you I don't have to cite to anything or

from any book that says that in an arc blast that oxygen is used as the oxidizer"); *id.* at 206 ("Q.

Is it correct that you have not cited to any peer-reviewed book, treatise or authoritative

publication in your report that states, specifically, in the case of an arc blast, the conductors react

with oxygen in the air to result in an accelerated chemical reaction? . . . A. It may not be cited.  It

may not be cite cited [sic] because, again, I did not pull that out of any book.").

     Nor do the other "indicia of scientific reliability" support McBride's opinion that the

incident here was a combustion explosion.  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d

at 412.  He conducted no testing, *see* McBride Dep. Tr. 201; cited to no peer-reviewed sources,

treatises, or authoritative publications, *id.* at 206; and was not able to identify a single other

expert in the scientific community who agrees with his interpretation, *id.* at 217-18.  In addition,

McBride's expertise on this topic is limited.  He is not a chemist and relies "almost exclusively

on a handful of unnamed chemistry classes that he allegedly took in college, over 35 years ago."

Def.'s McBride Mem. 1; *see also* Pl.'s McBride Opp'n 6.[2]  At bottom, the critical step in

McBride's reasoning — that an arc-blast involves a reaction with ambient oxygen and thus

---

[2]     In addition, Tower 570 argues that McBride's time designing electrical systems for a
chemical processing plant provides relevant experience.  Pl.'s McBride Opp'n 6.  There is no
question McBride is qualified to testify about the electrical system at 570 Lexington Avenue, but
designing "the power and control system" for a chemical plant does not a chemist make.  *Id*.

qualifies as a combustion explosion — is based on nothing more than McBride's *ipse dixit*.  To be sure, "[a] minor flaw in an expert's reasoning . . . will not render an expert's opinion *per se* inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Instead, "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*; *see Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020) ("[I]t is axiomatic that proffered expert testimony must be more than subjective belief or unsupported speculation" (internal quotation marks omitted)), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021) (summary order).

In short, the Court finds that McBride's central opinion — that an arc-blast is a combustion explosion because oxygen acts as an oxidizer — is not based on reliable data, methodology, or studies, and is thus inadmissible.  To the extent that AFM's motion seeks to preclude testimony on that issue, it is therefore GRANTED.

**C.  Tower 570's Motions to Preclude**

Tower 570 moves to preclude the testimony of two experts: Dale Cagwin and Christopher Minogue.  ECF Nos. 111, 113.  Cagwin, however, was retained by AFM merely "to provide an expert opinion responding . . . to the expert report of . . . McBride . . . regarding whether an arc fault is a combustion explosion and whether a combustion explosion occurred in connection with the arc fault on May 20, 2019."  ECF No. 113-1 ("Cagwin Report"), at 1.  In light of the Court's decision excluding McBride's testimony on that issue, the Court presumes that AFM has no need to call Cagwin as a witness and that the motion to preclude his testimony

is moot.[3]  Accordingly, the Court focuses here only on the motion to preclude the testimony of Minogue.

AFM retained Minogue to determine the scope of the restorative work that would be required to repair the damages caused by the arc-blast.  ECF No. 116-1 ("Minogue Report"), at 1.  Minogue examined the site of electrical vault on the twenty-third floor on March 15 and 16, 2021, nearly two years after the arc-fault occurred.  *Id.* at 2.  He took pictures of all four risers, which he states showed "recent repairs and or replacement of [Riser 1], while [Risers 2-4 did] not exhibit any apparent damage consistent with the arc fault in [Riser 1]."  *Id*.  As relevant to Tower 570's motion, he concludes "[b]ased on the conditions observed at the times of [his] inspections, as well as [his] experience in working on and evaluating high-rise building projects involving electrical riser damage, repair and replacements," that only Riser 1 would need to be repaired.  *Id*.

Tower 570 acknowledges that Minogue is "arguably competent to supply his opinion with respect to the pricing for the components involved in the replacement of the electrical risers."  ECF No. 115 ("Pl.'s Minogue Mem."), at 1-2; *see also id.* at 5 ("Minogue has admittedly *estimated* the cost of replacement in such risers in previous cases.").  But, Tower 570 continues, "his testimony strays beyond the scope of his qualifications into inadmissible opinions with respect to the question of whether the adjacent electrical risers sustained damage as a result of the arc-flash event."  *Id.* at 1-2.  More specifically, Tower 570 argues that Minogue's testimony must be precluded because he "has never actually performed any sort of testing or

---

[3]      If the Court's presumption is incorrect, AFM shall promptly advise the Court, and Tower 570 will be permitted to renew its *Daubert* motion to preclude Cagwin's testimony.

analysis of any risers to determine whether or not the risers are damaged" and that this kind of opinion would "require the expertise of a skilled electrician or electrical engineer." *Id.* at 5.

The Court disagrees.  First, although Minogue's opinion is indeed based primarily on a visual inspection of the risers, nothing in Tower 570's papers suggests that it is unreliable as a result.  Far from it, as McBride, who provided Tower 570's rebuttal to Minogue's report, *see* ECF No. 116-3, at 2-5, similarly relied on no more than a visual inspection to conclude that the risers *were* damaged, *id.* at 3 ¶ 4 (rebutting Minogue's conclusion that the risers are not damaged by "offer[ing] photos from the vaults which clearly show cracking of the cable wrapping as well as oil leakage"); *id* at 3 ¶ 5 ("[T]he severe cracking and dispersion of black soot and dust on the cables is evidence that these cracks occurred during the arc-blast.").  Second, in determining the costs of a repair, an estimator must, as a threshold matter, determine whether there was damage and, if so, whether the damage was caused by the claimed loss event.  ECF No. 118, at 2.  It follows that expertise in estimation — which Minogue concededly has — encompasses, to some extent, expertise in evaluating and determining damage causation.  To the extent Tower 570 argues otherwise, its arguments go to the weight of his testimony, not its admissibility, and are properly addressed through thorough cross-examination.  *See, e.g.*, *Boyce v. Weber*, No. 19-CV-3825 (JMF), 2020 WL 5209526, at *1 (S.D.N.Y. Sept. 1, 2020).

## MOTIONS FOR SUMMARY JUDGMENT

With that, the Court turns to the parties' motions for summary judgment.  Tower 570 seeks partial summary judgment with respect to the existence of insurance coverage and requests that the Court "set this matter for an inquest as to the scope and quantum of damages."  ECF No. 108 ("Pl.'s Mem."), at 1.  AFM cross-moves for summary judgment dismissing the case in its entirety.  ECF No. 123 ("Def.'s Mem."), at 1.

**A.  Applicable Legal Standards**

Summary judgment is appropriate where the admissible evidence and pleadings

demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.

2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof at trial,

the movant's burden will be satisfied if he can point to an absence of evidence to support an

essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects*

*Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc.*

*v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light

most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs.*,

373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is

sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.

2004).  To defeat a motion for summary judgment, the non-moving party must advance more

than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Where, as here, both sides move for summary judgment, a court is

"required to assess each motion on its own merits and to view the evidence in the light most

favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).  Accordingly, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

In an insurance coverage dispute, such as this, the insured bears the initial "burden of establishing a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property." *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).  This burden, with regard to an all-risk policy, is "relatively light." *Id.*  If it is met, the burden shifts to the insurer to establish the applicability of any exclusion.  *See, e.g.*, *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012) (citing *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 218 (2002)).  If the insurer carries that burden, and the insured seeks to establish coverage pursuant to an exception to the exclusion, the burden then shifts back to the insured.  *See, e.g.*, *id.* at 122 ("[A]fter an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies."); *see also Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 250 (S.D.N.Y. 2019) ("If the insurer establishes the applicability of an exclusion, the burden shifts back to the policyholder to show that an exception to the exclusion applies and, therefore, that the disputed claims are covered."), *aff'd*, 816 F. App'x 611 (2d Cir. 2020) (summary order). Ultimately, "[a]lthough the insurer has the burden of proving the applicability of an exclusion, it is the insured's burden to establish the existence of coverage." *Platek v. Town of Hamburg*, 24 N.Y.3d 688, 694 (2015) (citation omitted); *see also, e.g.*, *Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, 468 F. Supp. 3d 515, 541 (E.D.N.Y. 2020).

Finally, it is well established that the "interpretation of an insurance agreement is a question of law," *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 93 (2d Cir. 2018), as is the question of whether an insurance provision is clear or ambiguous, *VAM Check Cashing Corp. v. Fed. Ins. Co.*, 699 F.3d 727, 729 (2d Cir. 2012).  Under New York law — which the parties agree applies here, *see* Pl.'s Mem. 9-10; Def.'s Mem. 14 — "[t]he court must interpret the contract to give effect to the intent of the parties as expressed in the clear language of the contract," *Intelligent Digital Sys., LLC v. Beazley Ins. Co.*, 716 F. App'x 1, 3 (2d Cir. 2017) (summary order) (internal quotation marks omitted), and insurance policies are interpreted according to principles of contract law, "giving policy language its plain and ordinary meaning," *Zurich Am. Ins. Co. v. Liberty Mut. Ins. Co.*, 710 F. App'x 3, 6 (2d Cir. 2017) (summary order) (internal quotation marks omitted); *see also Olin Corp. v. American Home Assur. Co.*, 704 F.3d 89, 98-99 (2d Cir. 2012) ("Under New York law, insurance policies are interpreted according to general rules of contract interpretation . . . The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." (cleaned up)).

**B.  Discussion**

Here, there is no dispute that Tower 570 has met the "relatively light" burden of showing a prima facie case for recovery, *Int'l Multifoods Corp.*, 309 F.3d at 83, and for good reason: The AFM policy was an all-risk policy covering the 570 Lexington Avenue, SOF ¶¶ 1-2, 5; Tower 570 had an insurable interest in the building, SOF ¶¶ 6, 8; and the arc-fault was a fortuitous loss to the covered property, *see* Pl.'s Mem. 11; ECF No. 138 ("Def.'s Reply"), at 2.  Thus, whether Tower 570 is entitled to coverage from AFM turns, at least in the first instance, on whether an exclusion applies.  AFM relies primarily, if not exclusively, on the boiler and machinery exclusion, which, as noted, "excludes loss or damage directly or indirectly caused by or resulting

from" "boiler and machinery," defined as "[d]irect physical loss or damage originating within . . . all mechanical, electrical . . . equipment . . . [a]nd caused by, resulting from or consisting of . . . [e]lectrical or electronic breakdown."  AFM Policy 24, 40, 79.[4]  Complicating matters, however, the definition *also* includes a list of losses that *are* covered, even if caused by or resulting from "boiler and machinery."  *See id.* at 79.  As relevant here, "boiler and machinery as used in this Policy does *not* mean [p]hysical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss: [c]ombustion explosions, . . .; or . . . [f]ire."  *Id.* (emphasis added).

As an initial matter, AFM is plainly correct that the loss or damage at issue was "indirectly caused by or resulting from" "boiler and machinery" as that term is defined in the first instance.  In arguing otherwise, Tower 570 contends the exclusion is "labyrinthian in its construction" and that the definition is "tortured," "sprawling," and contains "competing anti-concurrent causation clauses."  Pl.'s Mem. 11-12.  In addition, Tower 570 takes issue with the fact that several relevant terms, including "explosion," are undefined.  *Id*. at 13-14.  But the Court disagrees.  Notably, Tower 570 does not actually advocate for a different interpretation of any of the specific terms of the exclusion.  But "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."  *Olin*, 704 F.3d at 99.  And Tower 570 obviously understood the significance of the

---

[4]    Nominally, AFM also invokes the "wear and tear" exclusion.  Def.'s Mem. 24-25.  But as Tower 570 correctly notes, whether that exclusion applies "is subsumed by the question regarding the 'boiler and machinery' exclusion" because "[t]he 'wear and tear' exclusion does not encompass 'physical damage not excluded by this Policy.'"  ECF No. 133 ("Pl.'s Reply"), at 7 n.10 (quoting AFM Policy 41-42).  Thus, "[i]f the 'boiler and machinery exclusion applies, so too does the 'wear and tear' exclusion.  "If the 'boiler and machinery' exclusion is inapplicable, then the arc-blast damage is 'physical damage not excluded by this Policy' rendering the 'wear and tear' exclusion inapplicable."  *Id.*  Accordingly, the Court focuses here solely on the "boiler and machinery" exclusion.

exclusion because it purchased a separate insurance policy from Travelers specifically to cover the building's boiler and machinery, which provided coverage for a "[b]reakdown," including "[e]lectrical failure including arcing" to "[c]overed [e]quipment," including "[a]ny other electrical or mechanical equipment that is used in the generation, transmission or utilization of energy." Travelers Policy 34-35; *see also* ECF No. 135-9 ("Kuna Tr."), at 58; Def.'s Mem. 2 ("Plaintiff, as a sophisticated property owner and insured, clearly was aware that its two separate policies issued by separate insurers covered entirely different building components."). Further, undefined terms in an insurance policy, such as "explosion," are not ambiguous merely because AFM's claims adjuster could not provide an accurate definition during her deposition. Pl.'s Mem. 13-14; Pl.'s Reply 25-27. That is an issue of law for the Court, which must give the term its ordinary and accepted meaning. *See In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir. 1998); *see also Rye Ridge Corp. v. Cincinnati Ins. Co.,* 535 F. Supp. 3d 250 (S.D.N.Y. 2021) ("An unambiguous policy provision must be accorded its plain and ordinary meaning, and the court may not disregard the plain meaning of the policy's language in order to find an ambiguity where none exists." (cleaned up)), *aff'd*, No. 21-CV-1323, 2022 WL 120782 (2d Cir. Jan. 13, 2022) (summary order).

Additionally, there is no real dispute that — if the loss was not caused by a "combustion explosion" or "fire" — AFM has established that boiler and machinery exclusion "applies in the particular case." *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42. AFM points to the testimony of David Kuna, the property manager for 570 Lexington Avenue whom Tower 570 produced as its corporate designee pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Kuna Tr. 11; *see Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015) (holding that Rule 30(b)(6) testimony "is 'binding' in the sense that whatever its deponent says can be used against the organization"). Kuna testified that it is the practice of the building's

management company to maintain two insurance policies, one for "property coverage" and one for "boiler and machinery coverage."  Kuna Tr. 58.  The Travelers B&M policy, not the AFM Policy, he explained, covers "mechanical" aspects of the building, including "[e]verything from plumbing, electrical, HVAC [and]. . . [t]he equipment and the infrastructure of that equipment." *Id*. at 59; *see also* Travelers Policy.  He agreed that "[t]he four riser cables . . . fall, within [his] understanding, of boiler and machinery."  Kuna Tr. at 59.  And there is no dispute that the loss event, the arc-fault, is a kind of electrical breakdown, *see* SOF ¶ 23 ("An arc-fault event occurs when the insulation on a conductor cable breaks down and faults or shorts."), nor that the arc-fault "originated" in Riser 1, part of the building's electrical equipment, *see* SOF ¶ 20.[5]

Thus, the parties' dispute ultimately turns on whether the arc-flash resulted in a "combustion explosion" or "fire," as they were explicitly excluded from the definition of "boiler and machinery" in the AFM Policy.  *See* Pl.'s Reply 4 ("[T]he narrow task before the Court on these competing motions for summary judgment is to determine whether there is a material dispute that the arc-blast resulted in fire and combustion explosion damage to Tower 570"); *id* at 11-21.  On that, Tower 570 bears the burden of proof.  Tower 570 argues otherwise on the ground that the exclusion from the exclusion for combustion explosion or fire is not an "exception" to the exclusion, but "part-and-parcel with the scope of the exclusion itself."  Pl.'s Reply at 11-12.  But that is a difference in semantics and to accept it would elevate form over substance.  Moreover, it makes more sense to allocate the burden to Tower 570, both because it avoids the need to prove a negative and because Tower 570 carries the ultimate burden of

---

[5]     AFM states that whether "Riser 1 suffered an arc-blast at the point of the 23rd floor electrical vault" is "[d]isputed" and that "[t]he arc-fault that resulted in the arc-blast originated within Riser 1, which was one of four risers located in the 23rd floor electrical vault."  *Id*. Whatever distinction AFM is attempting to draw does not change the fact that both agree the arc-fault, which resulted in the arc-blast, originated within Riser 1.

proving coverage.  Thus, AFM having shown that the boiler and machinery exclusion applies on its face, it is Tower 570's burden to demonstrate that the loss was caused by or resulted from a combustion explosion or fire.  *See, e.g.*, *Platek*, 24 N.Y.3d at 691, 694 (holding that a policy that excluded flood damage but noted that "[w]e do cover sudden and accidental direct physical loss caused by fire, explosion or theft resulting from [flooding]," created an exception to the exclusion that the insured had the burden to prove was applicable); *Borg-Warner Corp. v. Ins. Co. of N. Am.*, 577 N.Y.S.2d 953, 956 (N.Y. App. 3d Dep't 1992) (holding that a policy that excluded pollution but noted that "this exclusion does not apply if such discharge, dispersal, release, or escape is sudden or accidental," created an exception to the exclusion which the insured had the burden to prove was applicable).

In the absence of McBride's testimony on the subject, Tower 570 cannot carry its burden of showing that the loss was caused by or resulted from a combustion explosion and AFM is entitled to summary judgment on that issue.  That is because, without McBride's testimony, there is literally zero evidence in the record to support the theory that the arc-blast was a combustion explosion.  Accordingly, summary judgment must be and is granted to AFM on the question of whether the loss was caused by a combustion explosion.  *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) ("In view of the District Court's decision to exclude the testimony of plaintiffs' experts, summary judgment for defendant was appropriate."); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("Having determined that the district court acted within its discretion in excluding [the plaintiff's expert's] testimony, the plaintiff has no evidence in the record to support his theory . . .. As a result, summary judgment was properly granted."); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 356 (S.D.N.Y. 2019) (finding that "following exclusion of their expert witnesses[,] . . . plaintiffs have not come forward with sufficient reliable, non-speculative evidence from which a

reasonable factfinder could determine, by a preponderance of the evidence" that the defendant's product caused their injuries), *aff'd,* 982 F.3d 113 (2d Cir. 2020).

By contrast, the Court finds that there is genuine dispute of material fact regarding whether the damage to the riser and surrounding property from the arc-blast was caused by "fire" within the meaning of the AFM Policy. *See* Pl.'s Reply 14-17; Def.'s Reply 9-12. In the days after the blast, AFM hired Christopher Wixted as an "independent adjuster." ECF No. 135-7 ("Wixted Tr."), at 11. An independent adjustor is assigned to "investigate claims on behalf of insurance carriers so they can determine coverage and settle claims with their insured," but is not responsible for "determin[ing] whether there is coverage for the loss or not." *Id*. at 12-13; *see also* Def.'s Reply 11. In his initial email report to AFM, Wixted stated that the arc-fault "resulted in fire, heat, and smoke/soot. The fire, heat, and smoke/soot also caused damage to the three backup electrical cables. The [New York Fire Department] responded and extinguished the fire and the insured retained All City Restoration to complete the interior smoke and soot cleaning." ECF No. 135-6. In his deposition, Wixted reported that "the information in this e-mail first was provided to me by the public adjuster and the insured," Wixted Tr. 81, but that he had also personally inspected the vault, *id*. at 83, and observed "blackness like soot-type blackness, smoke and soot on [Risers 2-4]" and "heat damage" that "looked like cracking of the outer casing of the cables," *id*. at 90-91.[6] Similarly, Phil Mincone, Tower 570's building engineer who was on duty in the building at the time of the arc-fault and rushed to the twenty-third floor, reported seeing heavy smoke coming out of the riser chamber and firefighters

---

[6]       AFM argues that Tower 570 relies on no more than "hearsay (and double hearsay) statements and reports from non-eyewitnesses, including Lisa Anderson and Chris Wixted," to support its argument that a fire occurred, Def.'s Reply 11, but Wixted testified in his deposition to his personal observations.

engaged in "fire suppression activities"; specifically, "[t]hey had the standpipe hose stretched out from Stairway B to the vault area through the chamber area and they also had handheld extinguishing units that they were spraying into the chamber."  ECF No. 135-8 ("Mincone Tr."), at 18, 20-21, 74-75.  Given this evidence, a reasonable jury could conclude the damage was caused by a "[f]ire, or from the use of water or other means to extinguish a fire."  AFM Policy 79.

On the flip side, AFM has pointed to evidence in the record that the risers and surrounding property, if they were damaged at all, were damaged by "the pressure wave or some other concussive force caused by the rapid expansion of the arc-faulting conductors when they instantly vaporized," not by fire.  Def.'s Reply 12.  For example, Tower 570's expert, McBride, in his origin and cause letter, stated that "[t]he massive energy released in the fault rapidly vaporize[d] the metal conductors involved, blasting molten metal and expanding plasma outward with extraordinary force" and that "[t]he forces released and heat resulting from this arc-flash has left the remaining three 13.8 KV riser cables physically damaged."  ECF No. 105-10, at 2-3.  Similarly, Dana Reed, an estimator hired by Tower 570 to inspect the vault in the days after the blast, stated that, in her opinion, "the left-most electrical riser [Riser 1] experienced an arc fault. The resulting shockwave clearly compromised the integrity of all cables in the vicinity."  ECF No. 135-13, at 2.  Accordingly, both motions for summary judgment regarding whether the damage was caused by fire must be and are denied.  *See, e.g.*, *Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, 226 F. Supp. 2d 470, 478 (S.D.N.Y. 2002) (denying summary judgment where "material issues of fact" remain regarding whether "the excluded peril was the proximate cause of the loss"); *Hutch Enters., Inc. v. Cincinnati Ins. Co.*, No. 16-CV-01010 (WMS) (JJM), 2019 WL 5783574, at *11 (W.D.N.Y. Aug. 12, 2019) ("[The plaintiff] presented admissible evidence from [an expert witness] that controverts the opinions of [the defendant's] roofing experts that

the damage was caused by the pre-existing condition of the roofs, and is sufficient at this stage (even if against the weight of the other evidence) to raise a triable issue of material fact"), *report and recommendation adopted* at ECF No. 105; *In re Metro Concrete Corp.*, 157 B.R. 215, 218 (Bankr. E.D.N.Y. 1993) (denying summary judgment because "[t]he discrepancy as to whether the damage to the [c]rane was caused by an insured event creates an insurmountable issue of fact.").

## CONCLUSION

In summary, AFM's motion to exclude the expert testimony of McBride is GRANTED; Tower 570's motion to exclude the expert testimony of AFM's expert witnesses is DENIED; AFM's motion for summary judgment is GRANTED as to general applicability of the boiler and machinery exclusion and the inapplicability of the combustion explosion exception to that exclusion; and summary judgment is otherwise DENIED to both sides — namely, with respect to the applicability of the fire exception and the wear and tear exclusion.

Unless and until the Court orders otherwise, the parties shall submit a proposed joint pretrial order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within forty-five days of the date of this Opinion and Order**.  The Court will schedule a pretrial conference after reviewing the parties' submissions to discuss the procedures for and timing of trial in light of, among other things, COVID-19-related restrictions.

In the meantime, the Court is of the view that the parties should try to settle this case without the need for an expensive and potentially risky trial.  To that end, the Court directs the parties **to confer immediately** about the prospect of settlement and about conducting a settlement conference before the designated Magistrate Judge (or before a mediator appointed by the Court or retained privately).  If the parties agree that a settlement conference would be

21

appropriate, they should promptly advise the Court and, if needed, seek an appropriate referral and extension of the pretrial deadlines.

The Clerk of Court is directed to terminate ECF Nos. 103, 107, 111, 114, and 122.

SO ORDERED.

Dated: May 25, 2022
New York, New York

_____
JESSE M. FURMAN
United States District Judge